Kelly J. C. Gallinger
Aaron M. Dunn
BROWN LAW FIRM, P.C.
315 North 24th Street
P.O. Box 849
Billings, MT 59103-0849
Tel. (406) 248-2611
Fax (406) 248-3128
kgallinger@brownfirm.com
adunn@brownfirm.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| CERTAIN UNDERWRITERS at LLOYD'S, LONDON SUBSCRIBING TO POLICY NUMBER PGIARK05447-00,<br><br>            Plaintiff,<br><br>vs.<br><br>DUAL TRUCKING, INC. and ANTHONY ALFORD,<br><br>            Defendants. | Case No.: _____<br><br>**DECLARATORY COMPLAINT** |

COMES NOW Plaintiff Certain Underwriters at Lloyd's, London Subscribing to Policy Number PGIARK05447-00 (hereinafter "Underwriters"), by and through its counsel of record, and for its Declaratory Complaint alleges as follows:

**PARTIES AND GENERAL ALLEGATIONS**

1

1.     Plaintiff Underwriters is comprised of two different underwriting Syndicates:

      a.  Ark Corporate Member Limited, Syndicate 4020, is incorporated under the laws of England and Wales, and its principal place of business is London, England;

      b.  RenaissanceRe Corporate Capital (UK) Limited, the sole member of Syndicate 1458, is incorporated under the laws of England and Wales, and its principal place of business is London, England;

2.     The Schedule of Participating Underwriters for the Policy No. PGIARK05447-00, effective October 1, 2015 to March 31, 2016 (hereinafter "the Policy") includes Syndicate No. 4020 with the Pseudonym of Ark, Syndicate No. 1458 with the Pseudonym of RNR, and Syndicate No. 1084 with the Pseudonym CSL.

3.     Underwriters is authorized to transact business in the State of Montana.

4.     Defendant Dual Trucking, Inc. (hereinafter "DTI") is a citizen of the State of Louisiana, who, upon information and belief, is engaged in a variety of businesses, including, but not limited to, the hauling of oilfield waste.

5.     Upon information and belief, Defendant Anthony Alford is the president of DTI and is a citizen of the State of Louisiana.

6.     Venue is proper in this Court pursuant to 28 U.S.C § 1331(b) because the events giving rise to the instant Declaratory Complaint occurred in Montana, specifically in Roosevelt County, Montana, and DTI is subject to personal jurisdiction in Montana.  28 U.S.C. § 1331(b)(2)-(3).

7.     The amount in controversy exceeds $75,000.00.

8.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332.

9.     Underwriters issued the Policy, a Contractor's Pollution Liability insurance policy to Dual Trucking, Inc.;  with effective dates of October 1, 2015, to March 31, 2016, when the policy was cancelled prior to its expiration term.  A copy of the Policy is attached as **Exhibit 1**.

10.    The Policy includes clear choice of law provisions providing that the laws of the State of New York apply to disputes regarding the meaning, interpretation or operation of any term, condition, definition or provision of the insurance contract. While jurisdiction for this action properly lies in Montana, New York law clearly applies to the interpretation of the insurance policy at issue.

11.    In 2015, DTI was named as a defendant in a lawsuit filed in Montana's Fifteenth Judicial District Court, Roosevelt County, styled: *Garth Harmon, Wagner Harmon, and Shotgun Creek Developments, LLC v. Dual Trucking, Inc., a Louisiana corporation, Dual Trucking of Montana, L.L.C., a Louisiana limited liability company, Dual Trucking and Transport, L.L.C., a Louisiana limited*

3

*liability company, Anthony J. Alford, a Louisiana Resident, KJK Trucking, LLC, a*

*Louisiana limited liability company, Alford Farms, LLC, a Louisiana liability*

*company, Caron Transport Systems USA, Inc., a Delaware corporation, Whitney*

*Bank, a Mississippi corporation, Continental Resources, Inc., an Oklahoma*

*corporation, CETCO Energy Services Company, LLC, a Delaware Limited*

*liability company, Whiting Petroleum Corporation, a Delaware corporation, Hess*

*Corporation, a Delaware Corporation, Petro-Hunt, LLC, a Texas Limited Liability*

*Company, Purity Oilfield Services, a Texas Limited Liability Company, Zenergy*

*Operating Company, a Delaware Limited Liability Company, State of Montana*

*Department of Environmental Quality, and John Does 1 through 50* (hereinafter

"Underlying *Harmon* Action").  A copy of the operative Second Amended

Complaint in the Underlying *Harmon* Action ("the Complaint") is attached hereto

as **Exhibit 2**.

12.    The Complaint alleges in pertinent part as follows:

   a.  The Harmons own certain property in Roosevelt County, Montana.

   b.  In August 2011, the Harmons leased a portion of their property to DTI
       for the period from September 1, 2011, to September 1, 2026, to be
       used as a trucking mobilization facility to repair, dispatch and operate
       trucks.

c.   On or about December 8, 2011, DTI purported to assign the lease to another entity, Dual Trucking of Montana, LLC (hereinafter "DTM").

d.   DTI's lease with the Harmons contained a provision that permitted DTI to assign its lease under certain conditions, but provided that DTI would remain responsible for the premises, as well as the terms and conditions of the lease, to the Harmons.

e.   Between December 2011 and October 2012, DTI and/or others began hauling hazardous and toxic materials onto the property leased from the Harmons from the Bakken area in North Dakota.

f.   On or about July 26, 2012, DTM or another entity, Dual Trucking & Transport, LLC (hereinafter "DTT") began operating a solid waste disposal facility on the property leased from the Harmons, which handled oil field waste from North Dakota.

g.   On September 17, 2012, the State of Montana Department of Environmental Quality (hereinafter "MDEQ") sent DTI a warning letter regarding the operation of an unlicensed solid waste management system at the property leased from the Harmons; demanding that DTI discontinue operating such facility until properly licensed; requiring DTI to hire an environmental consultant to clean

up all solid waste on the property within fifteen (15) days; and to have
such solid waste removed to a licensed facility within thirty (30) days.

h. On September 26, 2012, the MDEQ inspected the property leased
from the Harmons and confirmed the operation of an unlicensed solid
waste management facility on the property.

i. Between October 5 and October 12, 2012, DTM and the Harmons
entered into three (3) leases for portions of the Harmons' property,
including one lease that terminated the lease between DTI and the
Harmons.

j. On March 13, 2013, the MDEQ sent DTI a violation letter demanding
the same corrective actions demanded in the MDEQ's September 17,
2012 letter.

k. In April 2013, representatives of the MDEQ met with representatives
of DTI, DTM and DTT, confirmed that a license was required for the
operation of a solid waste management facility on the property and
requested that an application for such a license be submitted by June
10, 2013.

l. Beginning in the summer of 2013, the Harmons became aware that a
spill of oil field wastes had occurred on its property and that the
boundary of such property had been breached, allowing unknown

6

contaminants to migrate off the premises and onto neighboring property.

m. In the fall of 2013, the Harmons tested its property as well as the neighboring property, and determined that they had been contaminated by the operations of DTI, DTM, and/or DTT.

n. On September 25, 2013, the Harmons notified DTM and DTI's common principal, Anthony Alford, of numerous breaches and defaults under the leases with respect to the presence of toxic and hazardous wastes at and/or around the property and demanded notification of the method, time and manner for cleaning up and removing the toxic and/or hazardous materials from the property and remedying the alleged breaches of DTM's leases.

o. On July 8, 2014, the Harmons notified DTM of their intent to terminate DTM's leases for breach due to, among other things, allowing toxic or hazardous materials to be incorporated into, brought on, stored at, placed at, used or otherwise disposed of on the premises.

p. On or about July 30, 2014, Mr. Alford executed a sublease of the property on behalf of DTM to a third party in which DTM represented that it was in the process of conducting certain environmental hazards and contamination remediation.

7

q.  On or about November 25, 2014, the MDEQ filed suit against DTT

alleging violation of numerous Montana statutes including operation

of an unlicensed solid waste management system, and disposal of

solid waste into or onto land so that solid waste may enter the

environment or be emitted into the air or discharged into waters.

r.  In its complaint, MDEQ alleged that the unlicensed waste facility was

operated at the premises from on or before July 26, 2012 through

April 30, 2014.

13.    The causes of action alleged by the Harmons against DTI and set forth in the

Complaint include: Breach of Contract; Declaratory Judgment; Quiet Title;

Negligence; Negligent Misrepresentation; Trespass; Nuisance; Restoration

Damages; and Misconduct Warranting Punitive Damages.

14.    The Harmons are seeking damages, including punitive damages, as well as

equitable relief.  The Harmons allege DTI is liable for damages far in excess of

$75,000.00.

15.    DTI has never tendered the defense and indemnification of the Underlying

*Harmon* Action to Underwriters.  Underwriters received notice of the lawsuit in

September, 2018, from another insurer purportedly involved in the defense of the

Underlying *Harmon* Action.  Underwriters has attempted to reach out to DTI

regarding the Underlying *Harmon* Action and the factual allegations in the

Complaint, but DTI has not responded to Underwriter's inquiries.

16.     On March 19, 2019, Underwriters issued a Reservation of Rights letter to

DTI and its President, Alford (collectively hereinafter "DTI") —through its third

party administrator, Premier Claims Management, LLC—agreeing to participate in

the defense of DTI in the Underlying *Harmon* Action under a reservation of rights

and to seek a judicial determination of coverage.  See March 19, 2019, Reservation

of Rights letter attached hereto as **Exhibit 3**.   Underwriters has agreed to

participate in the defense of DTI against claims made in the Complaint pending

coverage resolutions in this action.

## DECLARATORY RELIEF

17.     Underwriters incorporates Paragraphs 1 through 16 above as though fully set

forth herein.

18.     Currently there is a controversy regarding the respective rights and duties as

articulated in the insurance contract issued by Underwriters to DTI and as

described above.  The foregoing controversy entitles Underwriters to declaratory

relief under 28 U.S.C. §§ 2201 and 2202 and CPLR § 3001[1].  This controversy

includes the following:

---

[1] CPLR § 3001 is New York's statute regarding declaratory relief.

a.      Whether Underwriters has a duty to defend DTI in the Underlying

Action;

b.      Whether Underwriters has a duty to indemnify DTI for any judgments

or settlements made against DTI in the Underlying Action;

c.      Whether Underwriters is entitled to recover fees and costs it advances

on behalf of DTI for defense in the Underlying Action; and

d.      For such other issues as may arise in this litigation.

### The Terms of the Policy

19.     The Policy includes two coverage parts: a Contractors Pollution Liability

Part (hereinafter "Contractors Part"); and a Site Pollution Liability Part (hereinafter

"Site Part").

20.     The Policy's Contractors Part provides as follows:

Contractors Pollution Liability

**I. INSURING AGREEMENT**
We will pay on YOUR behalf all sums in excess of the Deductible that YOU are
legally obligated to pay as a result of a CLAIM for BODILY INJURY or
PROPERTY DAMAGE caused by a POLLUTION EVENT resulting from
COVERED OPERATIONS, provided that:

(1) Such BODILY INJURY or PROPERTY DAMAGE occurs during the
     POLICY PERIOD;

(2)  Progressive, indivisible BODILY INJURY or PROPERTY DAMAGE over
     a period of days, weeks, months or longer caused by the same, continuous,
     repeated, or related POLLUTION EVENT shall be deemed to have occurred
     only on the date of first exposure to such POLLUTION EVENT;

(3)  If the date of the first exposure is before the inception date of the first
Contractors Pollution Liability Policy issued to YOU by US, or the date of
the first exposure cannot be determined, but the progressive, indivisible
BODILY INJURY or PROPERTY DAMAGE continues to exist during the
POLICY PERIOD, it will be deemed to have occurred only on the inception
date of the first Contractors Pollution Liability Policy issued to YOU by US
which is applicable to the COVERED OPERATIONS from which such
POLLUTION EVENT resulted.

WE shall have the right and duty to assume the adjustment, defense and
settlement of any CLAIM to which this insurance applies.
Our duty to adjust, defend and settle all CLAIMS to which this insurance
applies ends when the  applicable Limits of Liability have been tendered into
court or exhausted by payment of LOSSES or CLAIM EXPENSES.

## II. DEFINITIONS

* * *

C.    CLAIM or CLAIMS means any demand received by
YOU alleging liability or responsibility on YOUR part
for LOSS because of a POLLUTION EVENT resulting
from COVERED OPERATIONS.
* * *
O.    PROPERTY DAMAGE means:
1.  physical injury to or destruction of tangible
property including the resulting loss of use thereof;
2.  loss of use of tangible property that has not been
physically injured or destroyed;
3.  CLEANUP COSTS; and
4.  NATURAL RESOURCE DAMAGE.
* * *
E.    CLEANUP COSTS means the necessary expenses
incurred in the investigation, removal and remediation
(including the associated monitoring, neutralization,
immobilization or disposal) of contaminated soil, surface
water, groundwater or other contamination.
* * *
I.    LOSS means:

11

1. monetary judgments, awards or settlements of compensatory damages arising from BODILY INJURY and PROPERTY DAMAGE;
2. related CLAIM EXPENSES.

However, LOSS does not include fines or penalties assessed against YOU; or exemplary damages including but not limited to punitive, multiple or treble damages.

\* \* \*

L.   NATURAL RESOURCE DAMAGES means the sum of:

1. reasonable direct costs, including costs of assessment, associated with action necessary to restore (including replacement) the natural resource to its baseline condition prior to the POLLUTION EVENT, and
2. the USE VALUE of injury to or destruction of natural resources, including the land, surface water, groundwater, subsurface strata, air, fish, wildlife, or biota between the time of the POLLUTION EVENT and restoration of the natural resources injured by the POLLUTION EVENT.

\* \* \*

N.   POLLUTION EVENT means the discharge, dispersal, migration, seepage, release, or escape of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, provided such conditions are not naturally present in the environment in the concentration or amounts discovered.

\* \* \*

F.   COVERED OPERATIONS means those activities performed by YOU or any entity for whom YOU are legally responsible at a job site.

G.   INSURED means:

1. the NAMED INSURED;

2. YOUR current or former principals, partners, executive officers, directors, stockholders or trustees while acting on YOUR behalf and within the scope of their duties as such;

3. YOUR current or former employees including leased personnel under YOUR supervision, but only for acts within the scope of their employment or lease agreement;

4. YOUR heirs, executors, administrators, assigns and legal representatives in the event of death, incapacity or bankruptcy, but solely with respect to the liability insured herein;

5. a retired principal, partner, officer, director or employee while acting within their duties as a consultant for YOU;

6. a client for whom the NAMED INSURED performs or performed COVERED OPERATIONS, provided that a written contract or agreement is in effect between the NAMED INSURED and the client. However, such clients are covered solely with respect to LOSS arising from COVERED OPERATIONS and are not covered for any LOSS arising from the client's own liability. Clients of the NAMED INSURED are covered only for Limits of Liability up to and not exceeding the amount required by the written contract with the NAMED INSURED and subject to the Limits of Liability of this Policy.

III. **EXCLUSIONS**

This Policy does not apply to any CLAIMS, CLAIM EXPENSES or LOSSES resulting from or arising out of:

\*\*\*

D. liability assumed by YOU under any oral or written contract or agreement except that this exclusion shall not apply to:

1. any CLAIM where legal liability exists in the absence of such contract or

2. liability for LOSS assumed in a contract or agreement that is an INSURED CONTRACT, provided that the POLLUTION EVENT resulting from COVERED OPERATIONS occurs subsequent to the execution of such contract;

\*\*\*

13

F. a POLLUTION EVENT existing prior to the inception date of the Policy known to YOU or any of YOUR principals, partners, directors, or officers, or any of YOUR employees with responsibility for environmental affairs, legal affairs or risk management, and which would reasonably be expected to give rise to a CLAIM;

G.  any dishonest, fraudulent, or malicious act, error or omission, or those of a knowingly wrongful nature or the intentional, willful or deliberate non-compliance with any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, executive order, or instruction of any governmental agency or body by or at YOUR direction except this exclusion will not apply to any INSURED who did not commit, participate in, or have knowledge of any of the acts described;

H. [the ownership, entrustment, maintenance, use, operation, loading or unloading of any AUTOMOBILE, aircraft, vessel or rolling stock beyond the boundaries of the site at which the COVERED OPERATIONS are being conducted; …][2]

I.  waste, contaminants, pollutants, or materials transported via AUTOMOBILE, aircraft, vessel, watercraft or railroad rolling stock beyond the boundaries of the site at which YOU are performing COVERED OPERATIONS for YOUR client;

J. real property, facilities or personal property owned, leased, or rented by YOU[.]

**V. CLAIM PROVISIONS**

    A. Notice of CLAIM

In the event of a CLAIM, YOU shall provide US prompt written notice containing particulars sufficient to identify YOU or any INSURED involved and reasonably obtainable information with respect to time, place and circumstances, and the names and address of any injured parties and of available witnesses.  YOU further agree to send US copies of all demands or legal documents as soon as possible.  YOUR knowledge of CLAIM shall be deemed to have occurred when a principal, partner, director or executive officer first learned of a CLAIM.

**VI.  CONDITIONS**

---

[2] As amended by the Policy's TRANSPORTATION OF CARGO – POLLUTION ENDORSEMENT (Form PGI EL 010 0210).

\* \* \*

## A. Action Against US

No action shall lie against US unless, as a condition precedent thereto, there shall have been full compliance with all of the terms and conditions of this policy, and both YOUR liability and the amount of YOUR obligations to pay has been finally determined either by judgment against YOU after an actual trial or by YOUR written agreement with the claimant or the claimant's legal representative with OUR approval.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join US as a party to any action against YOU to determine YOUR liability, nor shall WE be impleaded by YOU or YOUR legal representative.

\* \* \*

## G. Choice of Law and Jurisdiction

If a dispute arises over the meaning, interpretation or operation of any term, condition, definition or provision of this policy, YOU and WE agree that the substantive law of the State of New York shall apply regardless of the choice of law or conflicts of law principles.

In the event that YOU and WE agree to resolve the dispute by arbitration, the Commercial Arbitration rules of the American Arbitration Association shall apply.

21.  The Policy Underwriters issued to DTI provides in pertinent part as follows

under the Site Part:

Site Pollution Liability Policy

THIS POLICY APPLIES ONLY TO POLLUTION CONDITIONS DISCOVERED, OR CLAIMS FIRST MADE AND REPORTED,

15

DURING THE POLICY PERIOD. UNLESS OTHERWISE PROVIDED
BY ENDORSEMENT, COSTS, CHARGES AND EXPENSES
OF DEFENSE WILL BE PART OF, AND INCLUDED WITHIN, THE
APPLICABLE LIMITS OF LIABILITY. COVERAGE UNDER
THIS POLICY MAY DIFFER FROM THE COVERAGES AFFORDED
UNDER OTHER POLICIES THE INSURED MAY HAVE
PURCHASED. THE WORD "INSURED" MEANS ANY PERSON OR
ORGANIZATION QUALIFYING AS SUCH UNDER "WHO
IS AN INSURED" (SECTION III). OTHER TERMS IN BOLD FACE
TYPE ARE DEFINED TERMS WITH SPECIFIC MEANINGS
SET FORTH IN THE POLICY. PLEASE READ THE POLICY
CAREFULLY.

In consideration of the payment of the premium and in reliance upon the
statements in the Application, and subject to all the terms, conditions, and
limitations hereof and any endorsements hereto, the Company agrees with
the **Named Insured** as follows:

## I. INSURING AGREEMENTS

### Coverage A – Onsite Cleanup

1) The Company will pay cleanup costs that result from **pollution
conditions** at, on, or under the Insured's **site(s)** to which this insurance
applies, but the amount the Company will pay is limited as described in
LIMITS OF LIABILITY AND DEDUCTIBLE (SECTION VI).

2) This insurance applies to **cleanup costs** that result from **pollution
conditions** only if:

    a) The **cleanup costs** are caused by **pollution conditions** which take
       place in the **coverage territory**; and

    b) The **pollution conditions** commence after the Retroactive Date
       shown in the Declarations, if any, and before the end of the **policy
       period**; and

    c) The request for payment of **cleanup costs** is first made by the
       Insured, in accordance with paragraph 3. below, during the **policy
       period**.

16

3) A request for payment of **cleanup costs** by the Insured or someone legally representing the Insured will be deemed to have been made when the **pollution conditions** are first discovered by the Insured and reported to the Company during the **policy period**.

## Coverage B – Third Party Claims

1) The Company will pay on behalf of the Insured those sums that the Insured becomes legally obligated to pay as damages from **claims** for **bodily injury** or **property damage** that result from **pollution conditions** at, on, under or migrating from the Insured's **site(s)** to which this insurance applies. The Company will have the right and duty to defend the Insured against any **suit** seeking those damages. However, the Company will have no duty to defend the Insured against any **suit** seeking damages for **bodily injury** or **property damage** that result from **pollution conditions** at, on, under or migrating from the Insured's **site(s)** to which this insurance does not apply. The Company may, at its discretion, investigate any **pollution condition** and settle any **claim** or **suit** that may result. But:

    a) The amount the Company will pay for damages is limited as described in LIMITS OF LIABILITY AND DEDUCTIBLE (SECTION VI); and

    b) The Company's right and duty to defend end when the Company has exhausted the applicable limit of liability by the payment of judgments, settlements, or expenses under all Insuring Agreements or by the payment of any Defense expense which reduce the limits of liability.

2) This insurance applies to **claims** that result from **pollution conditions** only if:

    a) The **pollution conditions** take place in the coverage territory; and

    b) The **pollution conditions** commence after the Retroactive Date shown in the Declarations, if any, and before the end of the **policy period**; and

c) The **claim** is first made against an Insured (in accordance with paragraph 3. below) and reported to the Company during the **policy period** or any Extended Reporting Period.

3) A **claim** by a person or organization seeking damages will be deemed to have been made at the earlier of the following:

a) When written notice of such **claim** is received by the Insured; or

b) When the Company settles a **claim** in accordance with paragraph 1. above.

All **claims** for damages to the same person, including damages claimed by any person or organization for care, loss of services or death resulting at any time, will be deemed to have been made at the time the first of those **claims** is made against any Insured.

**Coverage C – Defense Expense**
The Company will pay, with respect to any **claim** we investigate or settle, or any **suit** against an Insured we defend:

1) All expenses the Company incurs, including but not limited to expenses incurred pursuant to its rights and duties to investigate, settle and defend **claims** and **suits**.

2) All reasonable expenses incurred by the Insured at the Company's request to assist the Company in the investigation or defense of the **claim** or **suit**, including actual loss of earnings up to $250 a day because of time off from work to attend any trial, deposition, or interrogatory at which the Company has requested the Insured's attendance, or at which such attendance is required by the court.

3) All costs taxed against the Insured in the **suit**.

4) Prejudgment interest awarded against the Insured on that part of a judgment the Company pays. If the Company makes an offer to pay the applicable limit of insurance, the Company will not pay any prejudgment interest based on that period of time after the offer.

5) All interest on the full amount of any judgment that accrues after entry of the judgment and before the Company has paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of the insurance.

These payments will reduce the limits of insurance shown in the Declarations.

## II. EXCLUSIONS

A.   **Applicable to Coverages A, B, and C:**

1) This policy does not apply to punitive damages, exemplary damages, multiplied damages, fines or penalties. However, this insurance will apply to punitive damages where allowable by law.

2) This policy does not apply to **cleanup costs**, **claims**, or defense expense:

   a) Arising out of or related to **pollution conditions** existing prior to the inception of this policy, and reported to any officer, director, partner or other employee responsible for environmental affairs of the named insured. This exclusion does not apply to **pollution conditions** disclosed to the company prior to the inception of this policy and scheduled by endorsement.

   b) Based upon or arising out of the liability of others assumed by an Insured under any contract or agreement, unless the liability of such Insured would exist in the absence of a contract or agreement.

   c) Arising out of or related to **pollution conditions** which result from the use, ownership, operation, maintenance or entrustment to others of any **auto**, aircraft, watercraft, or rolling stock owned or operated by, or leased, rented or loaned to any Insured.

   This exclusion shall not apply to pollution conditions which:

i)      Occur during loading or unloading operations performed at your **site(s)**; **or**

ii)     Commence during the transportation of **your product** or wastes by a **carrier**; and

iii)    Result in **bodily injury**, **property damage**, or **cleanup costs** during the transportation of **your product** or wastes; and

iv)    Commence on or after the inception of this policy.

\* \* \*

d)  Arising out of or related to **pollution conditions** at, on, under or migrating from any **site(s)** that first commence after such property is sold, given away, abandoned or condemned.

\* \* \*

f)  Arising out of or related to an Insured's intentional, willful or deliberate non-compliance with any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, executive order or instruction of any governmental or public agency or body either before or after policy inception.

\* \* \*

**B.**    **Applicable to Coverage A only:**

This policy does not apply to **cleanup costs**:

1)  Arising out of or related to or in connection with any **capital expenditure** or improvement to or at your **site(s)** unless the **pollution condition** was discovered in the process of incurring any **capital expenditure** or performing improvement to or at your **site(s)**.

\* \* \*

20

**C.**     **Applicable to Coverages B and C only**:

This policy does not apply to **claims**:

* * *

2)  Arising out of or related to **pollution conditions** at, on, under or migrating from any location to which the Insured has sent waste materials for treatment, storage or disposal, unless such disposal **site(s)** are designated on the Declarations Page or by endorsement.

3)  Arising out of **your product** or **your work** away from your **site(s)**.


## III. WHO IS AN INSURED


**A.**     If the **Named Insured** is designated in the Declarations as:

* * *

4) An organization other than a partnership, joint venture, or limited liability company, the **Named Insured** is an Insured. Its **executive officers** and directors are Insureds, but only with respect to their duties as officers or directors.

B.     Each of the following is also an Insured:

1) The Insured's **employees**, other than either its **executive officers** (if it is an organization other than a partnership, joint venture, or limited liability company) or its managers (if it is a limited liability company), but only for acts within the scope of their employment by the Insured or while performing duties related to the conduct of the Insured's business.

2) Any person (other than the Insured's **employee**), or any organization while acting as the Insured's real estate manager.

* * *

21

## IV. NOTICE REQUIREMENTS

As a condition precedent to the Insured's rights to coverage under this Policy, the Insured must give the Company notice of **pollution conditions** or **claims** as follows:

A.    If **pollution conditions** are discovered during the **policy period**, or if a **claim** is made during the **policy period** or, if applicable, during an Extended Reporting Period, the Insured must give written notice to the Company as soon as practicable, but in no event later than thirty (30) days thereafter, sufficient to identify such Insured and reasonably obtainable information with respect to:

1) The identity of the **site(s)** at issue, a description of the **pollution conditions** (including the time, place, cause, and nature thereof and other circumstances relating thereto), and all persons with relevant knowledge thereof.

2) Any and all information developed or discovered by the Insured regarding any **claim**, including all correspondence between the Insured and any claimant; all demands, summonses, notices or other processes, complaints or papers regarding such **claim** filed with any court, administrative agency or investigative body; all technical reports, laboratory data, field notes, or any other documents generated by persons hired by the Insured to investigate or remediate any **pollution conditions**; and all relevant expert reports, investigations, and data collected by experts retained by the Insured, whether or not the Insured intends to use the material for any purpose.

B.    The obligation of the Insured to comply with this notice provision will not be excused if the Company becomes aware of **pollution conditions** through any independent means.

* * *

## VII. DEFINITIONS

* * *

22

E. **Claim** means a written request or demand received by an Insured for money or services, including the initiation of a **suit** or arbitration proceedings against an Insured seeking damages. **Claim** includes any directive, order, requirement, court order or **suit** of the government of the United States or Canada or any local, State, or Provincial Government entity of the United States of America or Canada duly acting under the authority of environmental or related laws.

* * *

F.   **Cleanup** means the investigation, evaluation, monitoring, testing, removal, containment, treatment, disposal, remediation, detoxification or neutralization of **pollutants** to the extent required by Federal, State, Local or Provincial Laws, including but not limited to statutes, rules, ordinances, guidance documents, regulations, and all applicable amendments thereto, including state voluntary cleanup or risk based corrective action guidelines.

G. **Cleanup costs** mean the expenses incurred to perform a **cleanup**.  **Cleanup costs** do not include **capital expenditures**. **Cleanup costs** include **restoration costs**.

* * *

N. **Policy period** means the period set forth in the Declarations, or any shorter period upon **termination of coverage**.

O.  **Pollutant(s)** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis or toxic chemicals, and includes waste.

P.  **Pollution conditions** means the discharge, dispersal, seepage, migration, release or escape of **pollutants**.

* * *

R.  **Restoration costs** means reasonable and necessary costs incurred by the **insured** with the Company's consent, which shall not be unreasonably withheld, to restore, repair or replace real or personal property to substantially the same condition it was in prior to being damaged during work performed in the course of incurring **cleanup costs**.  However such **restoration costs** shall not exceed the appraised value of such property immediately prior to the **pollution conditions**  giving rise to

such cleanup costs or include costs associated with
improvements or betterments.

S. **Site(s)** means the specific location(s) designated on the
Declarations Page or by endorsement onto the policy.

\* \* \*

U. **Termination of coverage** occurs at the time of cancellation
or nonrenewal of this policy by the **Named Insured** or by the
Company, or at the time the Company deletes a previously
covered site.

V. **Your product** means:

1) Any goods or products, other than real property, manufactured,
sold, handled, distributed or disposed of by:
a) You;
b) Others trading under your name; or
c) A person or organization whose business or assets you have
acquired.

2) Containers (other than vehicles), materials, parts or equipment
furnished in connection with such goods or products.

Your product includes:

1) Warranties or representations made at any time with respect to the
fitness, quality, durability, performance or use of **your product**; and

2) The providing of or failure to provide warning or instructions.

\* \* \*

W. **Your work** means:
1) Work or operations performed by you or on your behalf; and

2) Materials, parts or equipment furnished in connection with such
work or operations.

**Your work** includes:

24

1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your work**; and

2) The providing of or failure to provide warnings or instructions.

## VIII. EXTENDED REPORTING PERIOD – COVERAGES B AND C

Upon **termination of coverage**, the **Named Insured** will be entitled to an Automatic Extended Reporting Period, and with certain exceptions as described in paragraph B. below, will also be entitled to purchase an Optional Extended Reporting Period, applicable only to Coverages B and C. Any Extended Reporting Period provided hereunder will only apply to a **claim** arising from **pollution conditions** that commenced prior to the end of the **policy period** and which are otherwise covered by this policy. If there is a **termination of coverage** for less than all of the Insured's **sites**, the Extended Reporting Provisions will apply with respect to those **site(s)** for which coverage was terminated. Neither the Automatic nor the Optional Extended Reporting Period will operate to reinstate or increase the Limits of Liability stated in the Declarations. Any **claim** first made and reported within either the Automatic or Optional Extended Reporting Period will be treated as if it had been made during the **policy period**. The Automatic Extended Reporting Period will not be applicable if the **Named Insured** exercises its option to purchase the Optional Extended Reporting Period. Neither Extended Reporting Period shall be available to the Insured in the event of nonpayment of premium.

A.   **Automatic Extended Reporting Period**:

   Upon **termination of coverage**, the **Named Insured** will be entitled to an Automatic Extended Reporting Period which will be in effect for the period of sixty (60) days after **termination of coverage** as defined herein or until the effective date of any insurance purchased by the **Named Insured** to replace this insurance, whichever is earlier.

B.   **Optional Extended Reporting Period:**

   Upon **termination of coverage**, the **Named Insured** will be entitled to purchase an Optional Extended Reporting Period.

25

The Company will issue an endorsement providing an Extended Reporting Period of up to sixty (60) months from **termination of coverage** hereunder applicable to any insured property, provided that the **Named Insured**:

1) makes a written request for such endorsement which the Company receives within thirty (30) days after **termination of coverage** as defined herein; and

2) pays the Company an additional premium charge determined by the Company within thirty (30) days of **termination of coverage** as defined herein. Such additional premium charge may not exceed 200% of the policy premium stated in the Declarations, as the same may have been adjusted from time to time.

If the additional premium is paid when due, the Extended Reporting Period may not thereafter be cancelled, provided that all other terms and conditions of the policy are met.

22.   Exclusion F of the Contractor's Part of the Policy applies to preclude coverage because DTI knew, or should have known, prior to the inception date of the Policy that a pollution event had occurred which was reasonably expected to give rise to a claim.

23.   Exclusion D of the Contractor's Part of the Policy applies to preclude coverage for any contractual claims alleged against DTI in the Underlying Action.

24.   Exclusion G of the Contractor's Part of the Policy applies to preclude coverage for claims made against DTI for its actions in operating or utilizing an un-licensed and un-permitted solid waste disposal facility as alleged in the Underlying *Harmon* Action.

25.    Exclusions H and I of the Contractor's Part of the Policy apply to preclude coverage for claims made against DTI for any operations that did not take place at a jobsite.

26.    Exclusion J of the Contractor's Part of the Policy applies to preclude coverage for any claims resulting from or arising out of real property or facilities leased or rented by DTI.

27.    DTI did not provide Underwriters with notice of the Underlying Action violating the "Notice of a CLAIM" condition in the Contractor's Part of the Policy.  DTI has never tendered defense or indemnification of the Underlying *Harmon* Action to Underwriters.

28.    Coverage is precluded under the Site Part of the Policy because the claims alleged in the Underlying *Harmon* Action did not arise from activity that took place on  the "site" listed in the Policy as 110 Machine Loop, Scott, Louisiana 70583.

29.    Coverage is precluded under the Site Part of the Policy because the pollution conditions alleged in the Complaint did not commence on or after the Retroactive Date, October 1, 2015, and before the end of the policy period, March 31, 2016.

30.    Coverage is precluded under the Site Part of the Policy because neither the claims against DTI were reported, nor any request for payment of clean-up costs

was made by DTI to Underwriters during the policy period or extended reporting period of the Policy.

31.   Exclusion A.2.(a) of the Site Part of the Policy applies to preclude coverage because the pollution conditions alleged in the Complaint existed prior to the inception date of the Policy and the pollution conditions alleged in the Complaint were not disclosed to Underwriters prior to the inception date of the Policy.

32.   Exclusion C.2 of the Site Part of the Policy applies to preclude coverage because DTI and others allegedly used property in Montana as a solid waste management facility and the Montana property is not listed as an insured "site(s)" under the Policy;

33.   Exclusion C.3 of the Site Part of the Policy applies to preclude coverage because the Montana property which is the subject of the Underlying Action is not listed as an insured "site(s)" under the Policy and claims in the Underlying Action arise from and relate to work performed by DTI in Montana.

34.   Exclusions A.1 of the Site Part of the Policy applies to preclude coverage for the punitive damage claim alleged in the Complaint.

35.   Exclusions A.2(b) of the Site Part of the Policy applies to preclude coverage for any contract claims alleged in the Underlying Action.

36.   Exclusions A.2(c) of the Site Part of the Policy applies to preclude coverage for any alleged pollution condition related to loading or unloading waste at the Montana property and which occurred prior to the inception date of the Policy.

37.   Exclusions A.2(f) of the Site Part of the Policy applies to preclude coverage for DTI's alleged operation or utilization of an un-licensed and un-permitted solid waste disposal facility.

38.   DTI did not provide Underwriters with notice of the Underlying *Harmon* Action or notice of the alleged pollution and, therefore, violated the Notice condition in the Site Part of the Policy.  DTI has never tendered defense or indemnification of the Underlying *Harmon* Action to Underwriters.

39.   As no coverage exists for DTI or any other "Insured" under the Contractors Part or Site Part of the Policy, Underwriters owes no duty to defend or indemnify DTI in the Underlying *Harmon* Action.

**WHEREFORE** Plaintiff Underwriters seeks declaratory relief in the following manner:

1.   That this Court find and declare Underwriters has no duty to indemnify DTI for the claims asserted against DTI in the Underlying Action;

2.   That this Court find and declare Underwriters has no duty to defend DTI in the Underlying Action;

3.      That the Court award to Underwriters reimbursement of defense fees and expenses, if any, Underwriters has paid in connection with its agreement to defend DTI; and

4.      That the Court grant such other and further relief as it may deem just and proper, including attorneys' fees, costs, and disbursements incurred by Underwriters in this action.

DATED this 3rd day of May 2019.

By: /s/ Kelly J. C. Gallinger _____
    Kelly J. C. Gallinger
    BROWN LAW FIRM, P.C.
    *Attorney for Plaintiff*

30